738 So.2d 36 (1999)
STATE of Louisiana
v.
William P. WALTON, Jr., Defendant-Appellant.
No. CR98-1433.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1999.
Writ Denied October 1, 1999.
*38 Michael Cade Cassidy, District Attorney, Bennett R. Lapoint, Lake Arthur, for State.
Alfred Frem Boustrany, II, Lafayette, for William Perry Walton, Jr.
BEFORE: YELVERTON, WOODARD, and GREMILLION, Judges.
WOODARD, Judge.
On or about June 16, 1996, William P. Walton, Jr., the Defendant, was arrested with approximately twenty pounds of marijuana in Jefferson Davis Parish. He informed authorities of an ongoing criminal enterprise that regularly transported marijuana to various locations in Southwest Louisiana. He plead guilty to a count of drug racketeering, conspiracy to commit drug racketeering, and possession of marijuana with intent to distribute. He received a twenty-five-year sentence in which all but fifteen years were suspended. He moved to withdraw his plea and have his sentence reconsidered. He appeals the trial court's denial of those motions. We affirm.

FACTS
The Defendant was arrested on or about June 16, 1996. On September 26, 1996, he was charged by bill of information with three counts of drug racketeering, in violation of La.R.S. 15:1352, and one count of conspiracy to commit drug racketeering, in violation of La.R.S. 15:1353. On the same date and on a separate bill of information, he was charged with one count of possession of marijuana with intent to distribute, in violation of La.R.S. 40:966. He was also charged with possession of marijuana in Vermillion Parish. On September 26, 1996, pursuant to a plea agreement reached with the State, he was allowed to plead guilty to counts three and four on bill of information, CR-6761-96 (CR98-1433), a single count of drug racketeering, and an additional count of conspiracy to commit drug racketeering. He also was allowed to plead guilty to bill of information, CR-6762-96 (CR98-1434), one count of possession of marijuana with intent to distribute. In return for the beneficial terms, he agreed to testify on behalf of the State against his co-conspirators. The two separate bills of information were addressed simultaneously as part of his plea agreement. Both arise out of the same set of facts and were handled together in the lower court proceedings. They have been consolidated for the purposes of appeal.
The Defendant filed a motion with the court to withdraw his plea of guilty on April 21, 1997. A hearing was held on June 10, 1997. The trial court assigned written reasons, denying his request to withdraw the plea on July 18, 1997. On December 1, 1997, he was sentenced to serve a total of twenty-five years on all three counts, to run concurrently, with the Louisiana Department of Corrections, with all but fifteen years suspended.
On July 20, 1998, the Defendant was brought again before the court on a Motion to Reconsider Sentence. The motion was denied. The court ruled that there was no basis to set aside the previously entered plea agreement, pending the dismissal of the Vermilion Parish charges. Thereafter, the District Attorney moved for leave of court to file a faxed transmission of the dismissal of the Vermilion Parish charges. The trial court ruled that the twelve-year offer never materialized in accordance with the plea agreement and that it was never accepted by the court. Again, the court sentenced the Defendant to serve twenty-five years with the Louisiana Department of Corrections, suspending all but fifteen years. The Defendant appeals.

ASSIGNMENTS OF ERROR
The Defendant claims the following assignments of error:

*39 1. The trial court erred in failing to allow him to withdraw his plea of guilty and stand trial on the original charges filed against him.
2. Alternatively, the trial court erred in failing to compel the State of Louisiana to honor its commitment to recommend a sentence of twelve years incarceration.

LAW

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After review of the record, we note two possible errors patent.
First, this court finds the trial court sentenced the Defendant to an indeterminate sentence. He pled guilty to three separate offenses. When sentencing him on July 20, 1998, the trial court stated the following:
The Court then at this time will sentence the defendant, on all three of these counts in these two respective cases, to serve 25 years with the Department of Corrections. The Court will suspend all but 15 years of that sentence. After serving 15 years of that sentence, then he would be placed on three years of supervised probation, with the following special conditions....
The trial court then imposed the special conditions.
It appears from the record that the Defendant agreed to a sentence of twenty-five years on each count, all to run concurrently with all but fifteen years to be suspended. However, the sentence pronounced by the court did not state a separate sentence for each count. Thus, the sentence imposed on July 20, 1998 is indeterminate. See La.Code Crim.P. art. 879.
However, we note that the Defendant was previously sentenced on December 1, 1997. When imposing the subsequent indeterminate sentence on July 20, 1998, the trial court failed to vacate the earlier sentence. In fact, no mention was made of the earlier sentence, and it is not clear from the record why the resentencing took place. At the July 20, 1998 hearing, the District Attorney stated there was an outstanding motion to reconsider sentence and a pending sentencing, awaiting the court's decision on the motion to reconsider sentence. The trial court then denied the motion to reconsider sentence, which actually appeared to be a motion to set aside the plea agreement, and sentenced him to the indeterminate sentence. Since the trial court did not vacate the original sentence, this court finds the second sentence is null and void, leaving the original sentence in effect. In State v. Brady, 506 So.2d 802 (La.App. 1 Cir.1987), appeal after remand, 524 So.2d 1356 (La.App. 1 Cir.), writ denied, 532 So.2d 175 (La.1988), the court found as an error the trial court's failure to vacate defendant's original sentence before reimposing the same sentence. The court also recognized as an error the trial court's failure to impose two separate sentences and obtain reports from the doctors appointed to the sanity commission. The court vacated the defendant's sentence and remanded for resentencing in compliance with the procedural requirements of La.Code Crim.P. art. 641 and, if the defendant were to be found competent, for two separate sentences to be imposed. Since Brady's sentence contained errors other than the trial court's failure to vacate the originally imposed sentence, it is not clear what the court would have done if the failure to vacate had been the sole sentencing error.
Similarly, in cases involving habitual offender hearings, La.R.S. 15:529.1(D)(3) requires the trial court to vacate the originally imposed sentence when resentencing defendant as an habitual offender. In a fifth circuit case, the court stated the following:
This court has consistently ruled that, where the original sentence on the underlying offense has not been vacated at *40 the time of sentencing defendant as an habitual offender, the original sentence remains in effect and the subsequent sentence as a multiple offender is null and void. State v. Henderson, 94-286 (La.App. 5 Cir. 12/14/94), 648 So.2d 974, 979; State v. Dearmas, 606 So.2d 567 (La.App. 5th Cir.1992). See also: State v. Walker, 416 So.2d 534 (La.1982); State v. Moffett, 572 So.2d 705 (La.App. 4th Cir.1990).
State v. Jackson, 95-423 (La.App. 5 Cir. 11/15/95); 665 So.2d 467, 469. In Jackson, the court vacated defendant's second sentence and remanded the case in accordance with its opinion. The present case is distinguishable since it does not involve an habitual offender proceeding. However, this analysis is applicable in this case. We find the Defendant's original sentence is still in effect. That sentence is not indeterminate. The following sentence was originally imposed on December 1, 1997:
In any event, the plea agreement reflects that the same sentence is to be imposed on all three (3) of these charges and they are to run concurrently. And the sentence is as follows: The sentencethe defendant is sentenced to serve twenty-five (25) years with the Department of Corrections, all but fifteen (15) years of which is suspended. After serving that time, he will be placed on three (3)years of supervised probation with the following special conditions: He must pay a twenty dollar ($20.00) per month supervision fee. He must comply with the conditions of Article 895 of the Code of Criminal Procedure. He must testify truthfully against all co-defendants and cooperate fully in any prosecution of those co-defendants. He must forfeit all weapons seized at the time of the arrest as well as forfeit the sum of two thousand four hundred and four dollars and fifty-one cents ($2,404.51) U.S. currency also seized at the time of the arrest, I presume.
Since the original sentence is determinate, this court finds no need to remand for resentencing. The Defendant will not be prejudiced by the original sentence remaining in effect, since the sentence imposed originally and the sentence imposed upon resentencing were for the same number of years in prison.
Also, we note that the Defendant was not informed of the time limitation for filing post-conviction relief at his resentencing. He was informed of such a limitation at his original sentencing. However, as we find the original sentence is still in effect, this court does not recognize any error.

ASSIGNMENT OF ERROR NUMBER 1
In assignment of error number one, the Defendant contends that the trial court erred in failing to allow him the opportunity to withdraw his guilty plea prior to sentencing. He maintains that the Welsh Police Office's failure to administer his prescribed antidepressant medication resulted in suicidal tendencies and an involuntary waiver of his constitutional rights. He further maintains that his plea agreement was prefaced on illicit promises of incarceration in the Jennings Police Department's facilities, rather than the Department of Corrections, and promises by his attorney that concurrent charges in Vermilion Parish would be dropped.
In the case sub judice, the Defendant filed a Motion to Withdraw Guilty Plea prior to sentencing, referencing specific allegations that his guilty plea was not the result of a knowing and voluntary waiver of constitutional rights and was the result of a breached plea bargain agreement. The trial court ordered a hearing on the issue to address his constitutional concerns. The trial court is to be given wide latitude in its decision on whether to grant this motion and where the record demonstrates that the plea was deficient, constitutionally or otherwise, the trial court should correctly allow the withdrawal of the plea. State v. Johnson, 95-626 *41 (La.App. 3 Cir. 12/13/95); 666 So.2d 1137, writ denied, 96-156 (La.4/19/96); 671 So.2d 925.
A defendant does not have an absolute right to withdraw a previously entered plea of guilty. The trial court is vested with the discretion to allow the withdrawal of a guilty plea at any time prior to sentencing; however, this discretion cannot be exercised arbitrarily and may be corrected on appeal. State v. Calhoun, 96-786 (La.5/20/97); 694 So.2d 909 and State v. Compton, 367 So.2d 844 (La. 1979).
The trial court assigned written reasons for denying the Defendant's Motion to Withdraw Guilty Plea, stating:
No credible evidence was introduced at the hearing on June 10, 1997 sufficient to establish that the plea agreement would allow the Defendant to choose the jail where he would serve his time in exchange for the defendant's guilty plea.
The trial court quoted the Defendant's September 26, 1996 Boykinization where the Defendant's attorney stated:
At this time, I'd just like to add that, while it is nonbinding, we would request that the Sheriff of the Parish of Jefferson Davis request that DOC place Mr. Walton here within the parish either athopefully at the Jennings PD.
The trial court found that no promises were made by the prosecutor in Jefferson Davis to reduce charges in Vermilion Parish. The trial court maintained that even if evidence existed, the motion was premature because the plea agreement was not complete, as defined, until after sentencing in Jefferson Davis Parish. We note that the Vermilion Parish charges were subsequently dismissed.
The trial court considered the Defendant's failure to receive his prescribed medication, prior to his plea being entered. He contends the absence of prescribed medication interfered with the knowing and intelligent waiver of his constitutional rights. The trial court found an absence of evidence indicating that law enforcement personnel intentionally withheld his medication. Furthermore, there was no evidence indicating that law enforcement were informed of the Defendant's personal medical needs. The trial court determined that his failure to take his prescribed medication may have increased anxiety levels but did not encumber his ability to understand the nature and significance of the rights he was waiving.
The critical inquiry is whether the trial court abused its discretion in denying the Defendant's Motion to Withdraw Guilty Plea. The Defendant may establish that his guilty plea was the product of duress, coercion, or ignorance, and not the result of a knowing and intelligent waiver of carefully explained constitutional rights, at which time the guilty plea would not satisfy constitutional guidelines, and should properly be set aside. State v. Lasseigne, 461 So.2d 1196 (La.App. 3 Cir. 1984).
The Defendant presents the following issue regarding this assignment of error:
Is a waiver of an accused's constitutional right to a trial and his plea of guilty to a felony a knowing, intelligent, free and voluntary act when it is done to get out of jail and avoid suicide by an accused who is incarcerated in a small jail cell in virtual solitary confinement, suicidal to the point that he would do virtually anything to get out of jail, is not taking his prescribed anti-depressant medication, and is offered an immediate, temporary release from incarceration in exchange for a waiver of his constitutional right to a trial?
The Defendant began cooperating with the local law enforcement authorities, after his arrest for possession of twenty pounds of marijuana. He was subsequently rearrested, based on the same facts, on multiple racketeering charges and possession with the intent to distribute; his bond increased from less than $25,000.00 to $150,000.00. He testified that law enforcement *42 "confiscated everything that he had," including his medication.
The Defendant, at the hearing on the motion to withdraw guilty plea, testified to the hardships he experienced in prison. He spent the first night of his reincarceration cleaning the jail cell and was made a trustee for this effort. He was allowed freedom of movement throughout the courthouse grounds and few limitations were placed on his ability to see and speak with his family. In the two-week period preceding his plea, several restrictions were placed on his individual personal freedoms. He was locked down for the majority of the time and allowed out of his cell only once or twice a week for a period of five to ten minutes to sweep the sidewalk. His cell was approximately six feet by six feet without doors or windows and restrictions were placed on his ability to communicate with his family. He was deprived access to a television, a radio, and newspapers; he was also denied access to cigarette lighters or reading materials. He expressed that the absence of his medication made it difficult for him to make a rational decision; that he was innocent of the charges and, if he had been rationally thinking, he would not have accepted the guilty plea.
The Defendant maintains that he began to experience suicidal tendencies after he was held in virtual solitary confinement without the proper administration of prescribed antidepressant medication. He contends that the extended periods of isolation and anticipation of a lengthy prison sentence compounded his feelings of despair. He argues that his acceptance of the plea agreement while in a mentally impaired state resulted from a constitutionally deficient waiver of rights.
J.D. Broussard, the Welsh Chief of Police, testified that the Defendant's visitation rights were restricted because of an abuse of visitation privileges and discontent by other prisoners concerning his preferential treatment. The restrictions placed upon him were no more severe than those on other individuals at the facility. Chief Broussard said that he never requested Prozac. Furthermore, he was never informed of his need for specific medication. Chief Broussard testified that he could not remember any specific threat of suicide, but did remember the issue arising so he brought in his minister to help alleviate the risk of harm to him.
The Defendant offered testimony from Dr. Thomas G. Latour, his treating psychiatrist since 1991. He was originally referred to Dr. Latour for treatment of anxiety and depression related to back surgery, adjustment disorder secondary to the work-related disability, problems associated with his inability to be gainfully employed, and chronic pain. Dr. Latour relied on drug therapy to relieve many of his symptoms. He was prescribed a pain killer, Valium, and an antidepressant, Prozac. Dr. Latour testified that the Prozac should be taken in conjunction with Valium, to counteract some of Valium's depressant qualities. Dr. Latour testified that because of these qualities, Valium taken without Prozac or another antidepressant is likely to cause problems.
In the weeks after the Defendant's arrest, Dr. Latour became increasingly concerned that he would commit suicide. His professional fears increased after he realized that he was facing long-term incarceration. On cross-examination, Dr. Latour testified that all observations and evaluations were made subsequent to the Defendant's release from incarceration.
The Defendant testified that in his desperation, he had determined that he could commit suicide by standing in the toilet and sticking his finger inside of a broken light fixture. He testified, "I didn't tell anyone that I was going to commit suicide. I just made the statement that I just of soon be dead...." He compared a few years in jail to death, but never attempted to take his own life. He testified that he would have attempted escape, if guaranteed that an officer would have shot him. *43 He made indirect references to the dispatcher concerning his inability to handle incarceration. He never threatened to commit suicide but did make additional indirect references to wanting to be dead. The Defendant testified that he never requested Prozac nor did he notify any member of the Welsh City Jail of his emotional well-being.
Dr. Latour relied on general observations over a six-year period, rather than an objective psychological examination. He was not symptomatic of schizophrenia or other bipolar disorder which may have necessitated diagnostic testing; thus, an objective examination, in Dr. Latour's opinion, would have been a waste of time. Dr. Latour considered him to be "legally medically competent" and able to make his own decisions. The majority of suicidal tendencies manifested themselves after his initial release from prison in September and October of 1996. Dr. Latour testified that most individuals awaiting trial, unless psychotic, experience anxiety, depression, and unhappiness but expounded that he was not showing emotional patterns consistent with other criminal sociopaths.
In conclusion, Dr. Latour said that it was his belief that his thinking and decision making processes were impaired because of the circumstances surrounding his incarceration and the State's failure to administer his prescribed medication. Dr. Latour remained concerned that he would harm himself if forced to return to prison.
In State v. Harrell, 607 So.2d 661 (La. App. 3 Cir. 1992), this court refused to set aside the defendant's guilty plea when the defendant contended that the trial court erred in finding his guilty plea was knowing and voluntary, despite the fact that he collapsed during his Boykinization. Evidence indicated that the defendant received antibiotics, penicillin shots, and pain killers prior to the taking of his plea and that he was forced to enter his plea a day earlier than he thought. The defendant in Harrell also contended that the medication consumed prior to entering the plea, together with having to make a hasty decision on whether or not to enter the guilty plea, put him in a stressful situation which prevented him from entering a knowing and intelligent plea. In Harrell, this court, stated:
As to defendant's physical condition, he may have suffered from various ailments, but there has been no showing that his state of health substantially impaired his effective participation in his defense. See State v. Karno, 342 So.2d 219 (La.1977). His illness may have indeed made the burden of trial more difficult, but the trial court was satisfied that it was not so severe as to deprive the defendant of the ability to understand the rights waived and other consequences of his guilty plea. The evidence regarding defendant's physical condition does not warrant a conclusion that defendant's weakened physical condition produced an involuntary guilty plea.
Id. at 663 (citing State v. Beatty, 391 So.2d 828 (La.1980)).
As in Harrell, the trial court in the present case made a conscientious effort to explain to the Defendant the consequences of the plea, the nature of the charges, possible penalties, and to determine whether the plea was knowingly and voluntarily given, as set forth and evaluated in the plea agreement form. The trial court then explained his right to a trial by jury, his right to confront his accusers, and his right against self-incrimination. Also, the court made sure that he understood the consequences of his plea and the possible penalties. He stated that he had discussed the case with his attorney and that he was satisfied with his attorney's representation. The Defendant testified at the Boykin hearing to establish a factual basis for the guilty plea and, seemingly, so that it could be used in support of the prosecution of other defendants.
He concluded his testimony by stating:
MR.WALTON: Yes, sir, Your Honor. I-I would like to say that I-I-I tried my *44 best to answer all questions truthfully and to the best of my recollection, and that if anything happens to come up in the future about this case, I'd be more than happy to help y'all with anything that I can.
THE COURT: Thank you, Mr. Walton. Court finds that this defendant is now competent, alert, and intelligent, that he understands the nature of the charge, consequence of pleading guilty, that by pleading guilty, he is waiving or giving up certain constitutional rights that he has, that his decision to plead guilty is freely voluntarily, and intelligently made. There is a factual basis for the plea....
Although the Defendant may have experienced anxiety prior to the admission of guilt, the record indicates his testimony and guilty plea were knowingly and voluntarily made with a full understanding of the gravity and importance of his decision to plead guilty. It appears that the guilty plea was entered, not as a result of the absence of his prescribed medication, but because of his aversion to long term incarceration and his desire to be immediately released from prison.
Therefore, the trial court's refusal to allow the Defendant's withdrawal of the guilty plea on grounds that he was not administered his prescribed medication was not clearly erroneous.
The Defendant also contends that his decision to plead guilty was made, in part, by promises of incarceration in Jefferson Davis Parish rather than the Department of Corrections. The record indicates that his decision to plead guilty was largely influenced by these terms.
If a plea rests in any significant degree on an agreement or promise by the prosecutor which can be viewed as an inducement for the plea, such a promise must be fulfilled or the defendant must be given an opportunity to withdraw the plea. State v. Lockwood, 399 So.2d 190 (La. 1981).
In State v. Readoux, 614 So.2d 175 (La. App. 3 Cir.1993), this court explained that a guilty plea is invalid, or constitutionally infirm, when a defendant is induced to enter a plea of guilty by a plea bargain agreement, or what he reasonably or justifiably believes was a plea bargain agreement, and the terms of the bargain are not satisfied.
Misunderstandings not induced by or attributed to representations made by the District Attorney or the trial court cannot be grounds for invalidating a valid guilty plea. The Defendant seemingly obtained all of his ideas regarding the agreement from his attorney. The record does not indicate that the District Attorney's office ever made any misrepresentations or promises to him. He said he never spoke with or had any direct contact with the District Attorney's office prior to the felony plea.
The Defendant contends that another primary consideration for his guilty plea was that the Vermilion Parish charges were going to be dropped, that he was going to be sentenced to fifteen years without a fine, and that he would be housed in the Jennings Parish facility, if he did not fight for the return of money or weapons confiscated by the Jefferson Davis Sheriff's office. He testified:
Well, the-the-the main thing that made me make the decision was that I could stay here in Jennings, which I was only twenty minutes from my house. I was told that being in the mechanic shop, I'd be working with Mike, that my wife and kids could come and go as they wanted.
. . . .
... If I didn't fight to get my money that they confiscated or my weapons that they confiscated, they wouldn't fine me.... All charges in Vermilion would be dropped.
The Defendant's wife, Laurie L. "Anna L." Walton, testified as to his mental condition *45 and his state of mind, generally, in the days preceding his plea of guilty. She verified that he was placed in a small, windowless cell at the Welsh City Jail. He was not allowed to possess books or reading material and was crying. She felt that he was not taking his prescribed medication. She also testified that his decision to plead guilty was largely induced by the State's promise to have him incarcerated at the Jefferson Parish facility, that the Vermilion Parish charges would be dropped, and that the federal charges would not be pursued. On cross-examination, his wife testified as follows:
Q. Did Mr. Kennison tell him [Defendant] that if he did not take the plea agreement that he would have to do a considerable amount of time in federal prison?
A. He said that the DA had told him that if Billy did not take the plea that Billy would get the maximum from Jeff Davis, Vermilion, and the Federal authorities.
The Defendant's father, William P. Walton, Sr., testified to his mental condition subsequent to the work-related injury and while in the Welsh facility. He further testified that his son was distant and described him as a "Zombie." He testified that he had no books and was unaware of the day or time. During his son's incarceration, he attempted to give him a watch, reading materials, and a calendar but was allegedly denied this request by the onduty officer. He said that his son was in a state of panic. Mr. Walton testified that his attorney told him that if he remained clean, he would be out of prison in one year; that if he pled guilty, he could be placed in any institute he chose, namely Kinder, Jennings, or Oakdale; that the Defendant personally felt incapable of making the decision of whether to plead guilty or to proceed to trial; and that it was his attorney who ultimately made the decision to plead guilty and his son relied on this decision. The defendant's father stated that he had played no part in his son's decision to plead guilty and that his attorney told him there was a risk of his son being confined to a mental institution.
The Defendant's sister, Debra Walton Robiceaux, was concerned about her brother committing suicide. She concurred that his attorney furthered the Defendant's belief that he would have a choice of correctional facilities. She felt that his counsel strongly encouraged the plea of guilty, although the decision was ultimately made by the Defendant.
The Defendant's mother, Mrs. William Walton, Sr., testified that her son was in a state of emotional turmoil. She testified that his attorney explained the plea and told her and her family of his maximum sentencing exposure. She testified that he felt that the plea agreement was his only viable option and that he had requested guidance from his family in making the decision to plead guilty.
The Defendant's attorney, Mr. Dan Kennison, testified that he wanted to move the plea along as quickly as possible, because the primary issue was not of guilt or innocence but of effective plea bargaining. The decision to plead guilty was made ultimately by him and the Defendant, but family members were included in the discussion so that he could be certain of his decision and the gravity of the situation.
The Defendant's attorney told him that he was assigned to the Department of Corrections and that if the sheriff failed to make the request, he would remain at their disposal. "I explained to my client, as I do in every case, what you have to do to land a particular facility and the bottom line practical answer is you have to contact the sheriff and he has to want you there." In the present case, the Jefferson Davis facility was in need of a mechanic and preliminary discussions with the sheriff had been completed.
His attorney testified that concurrent charges in Vermilion Parish were likely to be handled without additional prison time because of the small amount of *46 marijuana involved, his cooperation with the authorities, and his timely plea of guilty in the present case. He testified that Woody Woodruff, Vermilion Parish Assistant District Attorney, had agreed to drop the charges after he was assured that he was going to plead and after all formalities had been arranged. His attorney made no representations regarding a possible federal sentence, but it was his legal opinion that because of overlapping federal and state crimes, it was better not to let this charge languish and to be sentenced immediately in state court. The record indicates no misunderstanding between the State and the Defendant. Furthermore, if there was a misunderstanding, it was not induced by, or attributed to, anything said by the State. It is clearly settled that a misunderstanding between defendant and his attorney does not have the same implications as a breached plea bargain agreement. A misunderstanding of this nature will not render the guilty plea invalid. See State v. Hidalgo, 96-403 (La. App. 3 Cir. 11/6/96); 684 So.2d 26.
In its reasons denying the Defendant's Motion to Withdraw the Guilty Plea, the trial court stated that no credible evidence existed indicating that promises had been made to him regarding the terms and the conditions of incarceration in the Jefferson Davis facility. The trial court chose to believe the testimony of Defense counsel and the sheriff over the Defendant and his family members. The trial court was not manifestly erroneous in determining that no credible evidence existed establishing that his guilty plea was the result of illicit promises concerning the terms and the conditions of incarceration. Additionally, the trial court was not manifestly erroneous in determining that his guilty plea was not the result of his diminished mental capacity.
Further, there is no indication in the record that the Defendant misunderstood the proceedings or the consequences of his guilty plea because of the absence of his prescribed medication. The trial court properly explained his rights and the consequences of his plea and made additional efforts to insure that he entered a knowing and voluntary guilty plea. It was not clearly erroneous in finding that his failure to take his prescribed medicine was not instrumental in his decision to plead guilty; he knowingly and voluntarily waived his constitutional rights after being properly Boykinized. As for his argument that because of suicidal tendencies, he pled guilty without proper consideration of the constitutional rights he was waiving, the Defendant himself stated his willingness to return and assist the court and the record supports the conclusion that he understood what he was doing.
The trial court did not err in concluding that he was not promised a choice of correctional facilities. His plea of guilty was not prefaced on impossible terms, illicit promises, suicidal tendencies, or the absence of prescribed medication, but on a knowing and intelligent waiver of his constitutional rights.
His decision to withdraw his guilty plea caused the nonfulfillment of beneficial terms recommended by his attorney. The representations made by his counsel were supported by information at his disposal at the time he entered the plea. The representations did not vitiate the Defendant's knowing and intelligent waiver of his constitutional rights. Even if he wholly relied on the misunderstanding between himself and his attorney concerning terms of his incarceration, it is well considered that this does not have the same impact as a misrepresentation by the court or the District Attorney's office.
Furthermore, it was his attempted withdrawal of the previously entered guilty plea which was problematic, not the impossibility of the terms. Once he attempted to withdraw the guilty plea, negotiations with law enforcement concerning his choice of correctional facilities ceased. Moreover, the concurrent charges in Vermilion Parish have been dismissed in full satisfaction of the alleged agreement.
*47 The Defendant entered his guilty plea with a complete understanding of the nature and the consequences of the rights he was waiving, and the trial court did not abuse its discretion in denying the Defendant's Motion to Withdraw his Guilty Plea.

ASSIGNMENT OF ERROR NUMBER 2
The Defendant alternatively argues, by means of his second assignment of error, that the trial court erred in failing to compel the State to honor its promise of a twelve-year sentence. After the trial court accepted his guilty plea, which provided for a twenty-five-year sentence on each count to run concurrently with all but fifteen years suspended, his attorney attempted to renegotiate the agreement.
Mr. Kennison testified that he was successful in reducing his sentence to twenty-five years on each count to run concurrently, with all but twelve-years suspended. He felt that an agreement had been reached between himself and the District Attorney's office but that it had to be approved by the trial court. He testified that the trial court would have to be induced because this would require resentencing him. However, Mr. Kennison believed that the District Attorney's office would have made the recommendation. Notwithstanding, he thought that the Defendant was going to accept the agreement even though he was unhappy with it because the Defendant felt that he should receive zero prison time and a fifty-year probationary period.
Mr. Kennison testified:
Q. But you referred to the discussion that there was a binding agreement. Wouldn't it be more accurate to state that there was a bona fide offer from the DA's office of twelve (12) years, if the court would approve it, that the DA's office would recommend it?
A. Thethethe agreement was that the DA's office would recommend it. My client begrudgingly was going to accept that and that the and that the Judge had to be talked to about doing it. That he'd have to be induced.
The State never made the recommendation, and the court never approved of the agreement because the Defendant was not interested in keeping the plea agreement. Prior to the recommendation being made, he expressed a desire to withdraw from the guilty plea, he terminated his relationship with Mr. Kennison, and hired a new attorney. Mr. Kennison testified that he has had no further contact with him. The District Attorney, upon the revelation that the Defendant did not intend to comply with the terms of the agreement, informed Mr. Kennison that any additional deals were off and that the original plea agreement was to be enforced.
There was no indication that the Defendant had accepted the modified agreement. He did not rely on the renegotiated terms of the agreement; nor were these additional terms made part of the record or agreed to by the trial court. He terminated his relationship with his attorney prior to accepting the renegotiated terms. He never accepted the terms of the modified agreement. Therefore, the State was not required to make the recommendation.
The Defendant argues that if a plea agreement rested in any significant degree on an agreement or promise by the prosecutor, which is part of the inducement or consideration for the guilty plea, such a promise must be fulfilled. However, he cannot argue that the plea agreement was prefaced on the twelve-year term because all negotiations for a modified sentencing offer were subsequent to the plea agreement and his guilty plea. Furthermore, he did not accept the modified terms; thus he did not rely on these terms to his detriment.
The Defendant maintains that, "The Defendant's attorney met with the prosecutor and reached an agreement that the State will recommend a sentence of 12 years incarceration." However, the recommendation was never made to the trial court, *48 nor was the record supplemented with these more advantageous terms because of his attempt to withdraw his plea of guilty and his change of posture with regard to his assistance to the District Attorney's office against the other defendants.
Nevertheless, assuming arguendo that the District Attorney's Office was required to make the modified sentencing recommendation, the trial court was not bound by these recommendations and could have pronounced any appropriate legal sentence. State v. Malbroux, 485 So.2d 257 (La.App. 3 Cir.), writ denied, 489 So.2d 1273 (La. 1986), appeal after remand, 507 So.2d 319 (La.App. 3 Cir. 1987). See also State v. Barnes, 596 So.2d 302 (La.App. 3 Cir.1992); State v. Landry, 97-1460 (La.App. 3 Cir. 5/6/98); 711 So.2d 853; State v. Rios, 95-961 (La.App. 3 Cir. 3/6/96); 670 So.2d 708.
This assignment is without merit.

CONCLUSION
The trial court's refusal to allow the Defendant the opportunity to withdraw his plea of guilty was not an abuse of discretion and is affirmed. Additionally, since the second agreement reducing the Defendant's sentencing exposure was never entered into by the Defendant, the trial court did not abuse its discretion in failing to enforce the terms of the agreement and its decision in that regard should also be affirmed. The sentences imposed on July 20, 1998 are indeterminate. Thus, the sentences are vacated and set aside. However, since the trial court failed to vacate the sentences imposed on December 1, 1997, these sentences remain in effect and are affirmed.
AFFIRMED.